**John E. Windsor, Appellant, v. Kelly Coal Company, Appellee.**

**Gen. No. 14,377.**

BROKERS AND FACTORS—*what will not defeat recovery of commissions.* In an action to recover commissions by one who has been employed as an agent to effectuate certain results, a defense which consists of a charge that such agent has made certain secret and unlawful profits in connection with his employment, in order to defeat a recovery must be established by a preponderance of the evidence.

Assumpsit. Appeal from the Municipal Court of Chicago; the Hon. STEPHEN A. FOSTER, Judge, presiding. Heard in the Branch Appellate Court at the March term, 1908. Reversed and remanded. Opinion filed March 9, 1909.

NICHOLAS W. HACKER, for appellant.

CALHOUN, LYFORD & SHEEAN, for appellee.

MR. JUSTICE CHYTRAUS delivered the opinion of the court.

Appellant, Windsor, brought a suit in assumpsit in the court below against appellee, Kelly Coal Company, for breach of a contract to pay certain commissions. A trial by jury was had, a verdict for the defendant was returned and a judgment was rendered upon that verdict against plaintiff. This appeal was then taken.

The contract involved we find to consist of two writings, one dated April 17, 1906, made in Chicago, and the other dated May 26, 1906, made in Danville, Illinois. Both writings were made between John E. Windsor, of Chicago, appellant, and L. E. Fischer, of Danville, who was general manager of the Kelly Coal Company, appellee. It was contemplated and, in the first paper, provided that the coal company would step into the place of Fischer and assume his obligations under the contract. This the company subsequently did.

For the purpose of eliminating the paper of May 26 and thereby eliminating the defense of fraudulent performance of his duty, as agent, a main contention by appellant is that the paper of April 17 was executed and delivered as a transaction—and contract—complete in itself. We find no difficulty in arriving at the conclusion that both writings are part of one transaction, not completed without the paper of May 26, 1906. Windsor and Fischer, with their respective counsel, Judge McSurely and George T. Buckingham, met at the Auditorium Annex Hotel in Chicago, on April 17, 1906, and then prepared, and had signed by the two principals, the paper of the latter date. That paper provides: First, that Windsor shall immediately execute a writing releasing the Kelly Coal Company and the Kellyville Coal Company from all obligations, up to that date, by reason of any transactions between him and those companies. Second, that (a) Windsor shall procure a settlement between the Kelly Coal Company and the Standard

Oil Company of Indiana of all controversies then existing between those companies; (b) such settlement not to become effective, or operate as a performance of this contract by Windsor, until approved by the general manager of the Kelly Coal Company.  Third, (a) Windsor shall negotiate a contract between the Kelly Coal Company and the Standard Oil Company for the furnishing of coal by the former to the latter for a period of not to exceed two years beginning about May 1, 1906; (b) such contract not to become effective or operate as a performance by Windsor of this contract until approved by the general manager of the Kelly Coal Company.  Fourth, Fischer to cause the Kelly Coal Company to pay Windsor $5,000 within one year, to be paid by way of monthly installments as commissions on sales of coal by the Kelly Coal Company either to the Soldiers' Home, at Danville, or to some other local customer of the Company.  Sixth, Fischer to cause the Kelly Coal Company to pay Windsor an additional amount equal to two and one-half cents for each ton of coal delivered by that Company to the Standard Oil Company, under the contract to be negotiated with the latter.

That paper was signed by the parties, in duplicate, on April 17, 1906, without any intention on the part of either that there should be a delivery thereof at that time.  There is some conflict in the evidence whether the papers should be in escrow with Judge McSurely.  Certainly there was then no assent to a present delivery.  As part of the arrangement between the parties, Fischer was to obtain a guarantor for the carrying out of the contract on his part.  Consequently, Buckingham took one or both of the papers, it is neither clear nor material which, in order to procure the signature of W. B. McKinley, as such guarantor.  The next we learn of these papers, or either of them, is that on May 10, 1906, Fischer brought one of the copies to Judge McSurely's office in Chicago with McKinley's signature.  Fischer then handed that

copy to Judge McSurely saying: "I will give this to you, but I wish you would not deliver it to Mr. Windsor until the Standard Oil contract is actually signed." If McKinley signed but one of the papers, which appears to be so, then, obviously, that paper was the one which should go to Windsor upon final delivery between the parties. Windsor's actual possession of the other would not permit of an inference of delivery. We next hear of the papers at Decatur, on May 26, 1906. Up to that time we find no mutual assent to delivery. Windsor and Fischer then met in Buckingham's office to close the matter. Judge McSurely had brought with him from Chicago the required contract with the Standard Oil Company signed by that Company, to be signed by the Kelly Coal Company. It was found, however, that that contract contained no provision in terms obliging the Standard Oil Company to take the coal and, upon being communicated with by long distance telephone, that Company's attorney refused to permit an insertion or interlineation to that effect. However, on that occasion, the payment of the $5,000 was made by Fischer by way of checks and notes, which, together with the Standard Oil contract, then signed by the Kelly Coal Company, were placed in an envelope and given to Judge McSurely to procure the acquiescence of the Standard Oil Company to the desired insertion or interlineation. On that same occasion the parties made and signed the paper dated May 26, 1906, which is as follows:

"DANVILLE, ILLINOIS, May 26, 1906.

MR. L. E. FISCHER

DEAR SIR:—With reference to the contract entered into under date of April 17, 1906, between you and myself, and which contract was on the same date guaranteed by W. B. McKinley, of Champaign, Illinois, I beg to propose that in executing between us the terms of section 'sixth' of said contract, the following method shall be adopted, namely, that I will purchase through my concern, known as the Windsor Coal Com-

pany, in Chicago, Illinois, screenings to be purchased subject to your approval, and to be furnished by the Kelly Coal Company on its contract with the Standard Oil Company. I will purchase such amounts and at such times as may be arranged between us, and whatever the difference or profit is between the purchase price and the sale price of such screenings will be received by me as payment (so far as the same shall extend) upon the payment of my compensation due me under said Clause 'Sixth', and if said amount of profit shall be less than said amount of commission due me by reason of the provisions of said Clause 'Sixth', then the difference due to me shall be settled and paid by said Kelly Coal Company under the terms of said Clause 'Sixth'.

It is understood that I will not charge you any compensation upon the purchase of such screenings for you.

Yours very truly,
(Signed)   J. E. WINDSOR.

I hereby accept and agree to the above method of executing said Clause 'Sixth'.

(Signed)   L. E. FISCHER.''

The time or order of signature of these papers is a matter of less consequence. The time of delivery in conjunction with the inherent or intrinsic connection of the papers determines whether they constitute parts of one and the same transaction or distinct and separate transactions. We find them to be parts of one transaction and, together, to constitute one contract. Judge McSurely testified that on May 26 nothing was said as to when he should deliver to Windsor either the notes or the contract of April 17, 1906. On May 29, 1906, the Standard Oil Company gave the consent required of it and Judge McSurely then returned the Kelly-Standard Oil contract to the Kelly Coal Company. Since then, if not before, these parties have done business under that contract and Windsor has received, accordingly, his commission of two and one-half cents per ton except the part of such commissions involved in this suit. This suit involves

the commission for coal delivered by the Kelly Coal
Company to the Standard Oil Company for part of
the month of February 1907 and all of the months of
March, April, May and June of the same year.

By the contract between the parties hereto, as
evidenced by the paper of May 26, Windsor agreed,
substantially, that, through his concern, known as the
Windsor Coal Company, Chicago, he would, for and
on behalf of the Kelly Coal Company, purchase the
"screenings" to be furnished by it to the Standard
Oil Company, but without charging the Kelly Coal
Company any compensation upon the purchase of the
"screenings" for it, and, furthermore, it was agreed
that any profit difference there might be, between the
purchase price and sale price to the Standard Oil Com-
pany, should so far as it might extend, be applied upon
Windsor's commissions becoming due under clause
"sixth" aforesaid, and the shortage in the payment
of such commissions to be made good by the Kelly
Coal Company according to the terms of clause
"sixth". The parties, as they said, regarded this ar-
rangement as a method of executing or carrying out
clause "sixth".

Appellee, claiming to have ascertained that in act-
ing for it in the purchase of these "screenings" Wind-
sor took a fraudulent advantage of his position and
the relation between the parties, by making an illegiti-
mate profit in handling the "screenings", now ob-
jects to paying the commissions sued for. The con-
tention is that by his fraud, in that connection, appel-
lant has forfeited the right to collect any commissions
for his services to his principal. This defense is one
appellee was required to establish by a preponder-
ance of the evidence. For that purpose one witness,
Alfred L. Hansen, was called. Hansen had been as-
sociated with Windsor since 1898; first as a stenog-
rapher, then as a salesman and, later, in October, 1906,
his name was placed upon the stationery of the Wind-
sor Coal Company as secretary. After that time he

was to receive a salary of $100 per month and, in addition, one-third of the net profits of the business, which profits were to be applied toward the payment of one-third of the company's capital stock that he was to receive. Apparently there were no profits, so this arrangement came to nothing. About the first of January, 1907, Windsor and Hansen had some disagreement and separated. Windsor. sued Hansen. At that time, as he himself informs us, Hansen was not very friendly to Windsor. Hansen informed Hartshorn, manager of appellee, that Windsor was making a profit on the "screenings", and thus brought about this defense.

This information, according to Hansen, was furnished in the latter part of January; but, according to Hartshorn, appellee's manager, it was in the latter part of April or the first of May, 1907.

Hansen testified that shortly after the making of the contract between the Kelly Coal Company and the Standard Oil Company, Windsor told him that he, Windsor, was permitted to make no profit on the "screenings", but, they could take some jobber into their confidence, advise him of the price at which he could sell to the Kelly Coal Company and then divide the profits with him. J. H. Boys, of the Johnson City Coal Company, was suggested by Windsor as the jobber. The three, Windsor, Boys and Hansen, had a meeting where it was arranged Hansen should advise Boys of the price at which "screenings" should be turned in and that one-half of the profits should go to the Johnson City Coal Company and the other half to the Windsor Coal Company, but that the latter company's half would be paid to Hansen in currency so that the Johnson City Coal Company's books would show nothing paid to Windsor or his company; and Windsor then said that if anything turned up he, Hansen, was to take all the responsibility. Hansen, as he testified, then bought seventy-five or eighty-five cars of screenings from the Dering Coal Company and

had them reconsigned to the Johnson City Coal Company in pursuance of the arrangement; but, he says, when he made a demand for the half of the profits the Johnson Coal Company refused to pay without Windsor's sanction. Hansen in testifying, said: "I would be willing to take my share of the shady transaction." This arrangement was flatly denied by both Windsor and Boys. Boys, at the time he testified, was a salesman for the Windsor Coal Company, having left the Johnson Company April 1, 1907. Boys denies that any arrangement was made to keep anything off the books of the Johnson Company. He testified that the first he knew of this "screening" matter was that, early in August 1906, Hansen called him to the Windsor Company's office and when he came there Windsor was not in. Hansen then said: "If I can tell you where you can put a bunch of 'screenings' will you divide the profits deriving from such?" To which he, Boys, replied: "Providing the parties are of good standing financially, I would agree to it." Hansen then told him to go to the Kelly Coal Company and sell them a number of cars and he would furnish the numbers. Nothing was said of Windsor or the contract between the Kelly Company and the Standard Oil Company. Boys then went to the Kelly Company and made a sale and returning to the Windsor Company's office on the same day, in the afternoon, he found Windsor, but not Hansen, there. He then, supposing Windsor knew of the matter, asked him for the numbers of the cars, to which Windsor replied: "What cars?" When Boys explained Windsor said: "What is this? I don't understand anything about this deal. What is it?" and became very angry and said under no conditions would he have anything to do with it. In the latter part of the month he, Boys, met Windsor and he then told him Hansen had been to the Johnson Company's office and taken the matter up as a personal matter; at which Windsor said he would go to the Johnson Company's office and

straighten the matter out at once.  Boys met Hansen often and when he asked if the screening delivery was going on all right Boys replied it was.  Later, when Hansen came in regard to the matter of sharing the profits, Boys referred him to Windsor.  No part of the profit on this deal went to Windsor or his company.  Windsor, Boys also testified, went to the Johnson Company's office and gave instructions that no one connected with his company should receive any commission on this deal.  Boys received $103 from the Johnson Company in the transaction.  Holland, treasurer of the Johnson Company, knew of the arrangement with Hansen to split the commission.  Holland testified he paid to Boys the half, $103, in April 1907, as it was owing from them to some one.

Windsor's testimony coincides with and is corroborative of Boys' version of the transaction.  He adds that as soon as he learned of the transaction he went to the Kelly Coal Company and told the manager about it and that he was sending him a corrected bill.

When Hansen was no longer in the employ of Windsor he repeatedly sought to obtain from the Johnson Company this commission or "split" as a personal matter of his own.

To us it is perfectly clear not only that the preponderance of the evidence is not with the defendant, on this question of fraud, but, according to the evidence in this record, the preponderance is, clearly, the other way, and for that reason the judgment herein is reversed and the case remanded.

*Reversed and remanded.*